IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Martin Donald Laskowski, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 50392 |
| v. | ) | |
| | ) | Judge Philip G. Reinhard |
| Troy J. Morgan, Tony S. Gillette, and | ) | |
| Dr. Bessie Dominguez, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

    For the reasons stated below, the motion for summary judgment filed by defendants Troy J. Morgan and Tony S. Gillette [222] is denied. The motion for summary judgment filed by defendant Bessie Dominguez [219] is granted, and summary judgment is granted to defendant Dominguez. Plaintiff's counsel and counsel for defendants Morgan and Gillette are directed to contact Magistrate Judge Schneider's courtroom deputy within 30 days to arrange for a settlement conference. The court thanks appointed counsel for their vigorous representation to date on plaintiff's behalf.

**MEMORANDUM OPINION AND ORDER**

    This is an Eighth Amendment deliberate indifference case brought by plaintiff Martin Laskowski, regarding medical treatment he received while an inmate at Dixon Correctional Center ("Dixon"). Plaintiff filed his initial complaint *pro* se, but is now represented by appointed counsel. Two summary judgment motions are before the court. They address separate issues and involve different defendants. One motion is brought by defendants Troy Morgan and Tony Gillette, two Dixon correctional officers. Plaintiff alleges that they failed to promptly get him emergency medical treatment when he was found unresponsive on the floor of his cell early in the morning on March 21, 2012. He had overdosed on pain medications in an apparent suicide attempt. This part of the case concerns a small slice of time, approximately one hour. By contrast, the second part of the case covers a longer period, from November 2011 to June 2013. Over this 20-month period, plaintiff experienced ongoing back pain that he believes was not treated aggressively enough by defendant Dr. Bessie Dominguez. She is represented by different counsel, and has also moved for summary judgment. Both motions have been separately briefed.[1]

---

[1] Both motions are evaluated under the well-known, two-part deliberate indifference framework. The first part of the test asks whether plaintiff suffered from an objectively serious medical condition. *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 751 (2021). The second part asks whether the individual defendants were deliberately indifferent.

1

### I. Defendants Morgan and Gillette—Their Alleged Delay In Getting Plaintiff Emergency Medical Treatment After He Was Found Unresponsive In His Cell

Defendants Morgan and Gillette raise two main arguments for summary judgment. Their first argument, which is the more developed one, is that no jury could find that they were deliberately indifferent. The court will begin by considering the facts and arguments presented by defendants in their opening brief and Rule 56.1 statement of material facts. Here are the first ten paragraphs from that statement:

- 1. At approximately 5:30AM, March 21, 2012, [Troy Morgan] was conducting routine rounds and cell counts in Housing Unit 27 [at Dixon].

- 2. When Morgan arrived at cell number 52 he observed Plaintiff on the floor of his cell. Plaintiff appeared to be sleeping heavily, and snoring. Plaintiff had no cuts, bruises or other marks on his person indicating he fell.

- 3. Plaintiff's cellmate told Morgan that Plaintiff's heavy sleeping on the floor was not an uncommon situation.

- 4. Morgan was unable to wake Plaintiff by calling his name, so Morgan contacted his supervisor at the time, [Officer Gillette].

- 5. Gillette was similarly unable to rouse Plaintiff, so he contacted nursing staff.

- 6. After additional attempts to wake Plaintiff, including the use of smelling salts[,] Plaintiff was still sleeping and snoring heavily.

- 7. Gillette had to get smelling salts from a nurse as he did not carry them.

- 8. Gillette retrieved a backboard from the health care unit ("HCU") and loaded Plaintiff onto a transport van.

- 9. Plaintiff arrived at the HCU at approximately 6:20AM.

- 10. An ambulance arrived at approximately 6:39AM. Paramedics were with Plaintiff at 6:40. The ambulance departed at 6:58AM. The ambulance arrived at the hospital at 7:04AM.

DSMF ¶¶ 1-10 (internal citations omitted).

It should be noted that this version of the facts is based on IDOC internal investigation documents created shortly after the incident. On March 21st, right after plaintiff was taken to the Healthcare Unit, defendant Morgan filled out an Incident Report, which he was required to do

2

according to IDOC rules. Ex. D; Morgan Dep. at 112. In this report, Morgan summarized what had just taken place. The ten-paragraph summary set forth above is based on, and consistent with, this same-day description given by Morgan. Also on March 21st, Andrew Schott, an IDOC internal security investigator, began his investigation into this incident. (Schott would later emerge as a key witness in this case, for reasons explained below.) That same day, Schott interviewed plaintiff's cellmate, Donald Tyler, and summarized the interview in an IDOC document entitled Investigational Interview. Ex. A. Eight days later, on March 29th, Schott interviewed Gillette and filled out the same Investigational Interview form. Ex. B. On April 11th, Schott interviewed Morgan and also completed an Investigational Interview form. Ex. C. After the conclusion of his overall investigation, Schott submitted a four-page Report of Investigation, which attached 17 documents and summarized all the evidence bearing on this incident. Ex. 1. This evidence included the interviews referred to above, as well as interviews of plaintiff and others; documentary evidence including plaintiff's medical records; physical evidence; photographs; and other information. Based on all this evidence, Schott concluded that plaintiff "attempt[ed] to commit suicide [on March 21st] by ingesting the medication issued to him on March 20, 2012." *Id.* at 5. Defendants' version of the facts is based on these near-contemporaneous documents. Because this case was stayed for three years at plaintiff's request, to allow him to pursue related claims in the Illinois Court of Claims [16, 44], counsel was not appointed until 2017. As a result, the depositions in this case was not taken until many years after the incident. Neither side relies on the defendants' depositions in any material way, likely because they testified that could not recall what happened and largely stuck to the version of events set forth in the investigation documents described above.

Based on the ten-paragraph summary of facts set forth above, defendants argue that no reasonable jury could find that they were deliberately indifferent in their handling of this medical emergency. In fact, they go further and portray themselves as essentially heroes who may have saved plaintiff's life by their quick-thinking decisions. Set forth below is an excerpt from defendants' opening brief that spells out these arguments in greater detail:

> Morgan particularly made crucial decisions that may have saved Plaintiff's life. Morgan could have walked away and said this guy is just sleeping, Morgan could have listened to Plaintiff's cellmate, but he did not. He contacted Defendant Gillette. Gillette did not determine that Morgan was being needlessly, overly cautious. Gillette also did not listen to Plaintiff's cellmate. Gillette attempted to verbally rouse Plaintiff. Gillette contacted the HCU and got smelling salts from a nurse to try to rouse Plaintiff. When none of that worked, Gillette personally got a backboard and loaded Plaintiff on a transport vehicle to the HCU.

[224 at 6 (internal citations omitted).]

These arguments, on their face without yet considering plaintiff's side of the story, are persuasive. The gist of these arguments is that, even if defendants may have believed for the first few minutes that plaintiff was merely sleeping, they continued to investigate and monitor the situation and eventually realized that this was a medical emergency and promptly got him to the Healthcare Unit where he was treated and then taken to the hospital. If the court were limited to

3

this version of facts, then it would be inclined to grant summary judgment to defendants because there is little evidence in this particular account to suggest anything was amiss. However, upon reading plaintiff's response brief, it quickly became apparent that defendants had presented—as plaintiff fairly accurately describes it—a "skewed and incomplete story." [234 at 4.] Although there are several areas that could be criticized, the biggest problem by far—the proverbial elephant in the room—is that defendants have glossed over an unexplained gap of approximately 50 minutes in the middle of their chronology. Defendants described the facts in a way to suggest that there was one continuous sequence of activity over a short span of several minutes. But a closer examination of the facts indicates that there were two separate short phases of activity with a puzzling 50-minute gap in between them.

To explain further, in the first phase, defendant Morgan began his rounds and found plaintiff lying on the cell floor snoring. Morgan tried to wake him but was unsuccessful.[2] Plaintiff's cellmate allegedly told Morgan that it was "not uncommon" (or "no big deal" or words to that effect) for plaintiff to be sleeping heavily on the floor. The cellmate may have suggested also that the heavy sleeping was caused by plaintiff's medication. After trying to wake plaintiff, Morgan immediately called Gillette, his supervisor, who arrived right away. Gillette tried to rouse plaintiff, but was also unsuccessful. In total, this phase lasted around five minutes at most.

Then the 50-minute gap took place.[3] The question of what happened during this time in remains a mystery to this day. But it is undisputed that plaintiff remained unresponsive on the floor of his cell the entire time.

Sometime around 6:20 a.m., the second phase of activity began when Gillette called Nurse Berkeley who was working in the Dixon Healthcare Unit. This was the first time either defendant had tried to contact her or any other medical professional. What triggered this second round of activity is not known. In any event, during this phase, the situation was apparently viewed as more urgent. After calling Nurse Berkeley, but before she could respond, Gillette rushed to get smelling salts and a backboard from the Healthcare Unit and then went back to plaintiff's cell. Gillette tried to wake plaintiff with the smelling salts, but was unsuccessful. Gillette used the backboard to help load plaintiff onto a van, and then he was taken to the Healthcare Unit.

Plaintiff arrived at the Healthcare Unit at around 6:25 a.m. Nurse Berkeley evaluated him. He did not respond to verbal or tactile stimulation. He had an oxygen saturation level of 84%. An ambulance was called. He was placed on a 100% oxygen re-breather, which raised his oxygen saturation level to 100% within five minutes. He was taken to a nearby hospital where he was admitted in a comatose state and was intubated and placed on a ventilator. It is undisputed that he was then in status epilepticus, which means that he had suffered from extended periods of seizures. In his first several days after admission, he had at least four seizures, three of which were for 20-

---

[2] The record is not clear exactly what actions Morgan and Gillette took each time they tried to rouse plaintiff. They stated that they called out his name. Morgan also testified that, although he did not have any direct recollection, he likely would have tried to "[t]ap [plaintiff] on the shoulder," but "probably" would not have shaken him. Dep. at 61.

[3] The times set forth in the chronology might vary a few minutes here and there such that the gap could have been only 45 minutes, but everyone agrees that it is in the ballpark range of 50 minutes.

4

80 minutes long. He was on life support for at least a week. After consulting with his family, doctors took him off life support on April 3, 2012. They expected him to die. However, he survived and slowly came out of his coma. On April 10, 2012, he was taken back to Dixon.

Turning back to the 50-minute gap, it is the focal point of plaintiff's argument for deliberate indifference. A number of questions naturally arise. The most obvious one: what were defendants doing during the 50 minutes? Defendants have never offered any explanation insofar as the court can tell. In Morgan's Incident Report, he did not acknowledge the gap or otherwise give any hint as to what might have been going on during this time. In their opening summary judgment brief, defendants also failed to offer any explanation and even, as noted above, offered a version of facts arguably hiding the 50-minute gap. Not surprisingly, in plaintiff's response brief, the gap was mentioned repeatedly and prominently. At this point, one might expect that defendants, in their reply brief, would finally offer some explanation. But their reply is again largely silent, with only a passing conclusory reference to this critical issue. They did not take issue at all with the assertion that there was, in fact, a gap of approximately 50 minutes. With no explanation from defendants, a factfinder could reasonably have suspicions about what was going on. One could speculate now about possible explanations and defenses. Maybe defendants were pulled away by some emergency or got overwhelmed by a busy and demanding workload that morning?[4] Maybe as Morgan continued on his rounds, he pondered the situation and then had second thoughts about his original conclusion that plaintiff was sleeping harmlessly and went back to check a second time? If defendants had come forward with an explanation along these lines, then perhaps they could argue that they were merely negligent but not deliberately indifferent. To make such an argument, they might have to admit that they made a mistake by walking away initially. However, defendants have not explicitly offered any argument along these lines.

Even so, in their briefs, they repeatedly refer to facts that nod in the direction of an "honest mistake" defense. Specifically, they note that they heard plaintiff snoring; they did not see any cuts, bruises, or marks indicating he might have fallen; the cellmate allegedly told Morgan that it was "not an uncommon situation" for plaintiff to be sleeping heavily on this floor due to the medication he was on; and Gillette saw inmates sleeping on places other than their bed "all the time." *See* Exs. C, D, J. Although these facts appear to be offered for the purpose of suggesting that defendants had valid reasons to believe that there was no medical emergency, these facts are really red herrings. Defendants' theory of the case is that they were life-saving heroes *because* they did not simply accept the explanation that plaintiff was sleeping. They emphasize that they *ignored* the cellmate's explanation that this was not an uncommon situation. They note that Morgan did not simply continue on his rounds after he first discovered plaintiff. Instead, after failing to rouse plaintiff, he immediately called Gillette. This was all in the first five-minute phase of activity. These actions suggest, at a minimum, that Morgan had serious concerns about plaintiff's welfare *right from the beginning*. *See* Morgan Dep. at 114 ("Q. []You thought that more was going on here than an inmate just sleeping on the floor, right? A. I figured it was possible, yes. Q. You would not have notified Gillette just because an inmate was sleeping on the floor, true? A.

---

[4] In their 56.1 statement, defendants state that Gillette on this day "was responsible for approximately 9-10 housing units plus the sally port." DSMF ¶ 11.

5

Correct.") Yet, with this knowledge, they then waited for 50 minutes for reasons that are unclear. Again, it is not known what they were doing during this time.

The next obvious question to ask is what triggered them at 6:20 a.m. to suddenly begin a second attempt to rouse plaintiff after the 50-minute gap. What made them think, this second time round, that the situation was now an emergency calling for prompt action? No new information had come to light insofar as the court can tell. It appears that the trigger was merely that they were again unable to rouse plaintiff. But if the evidence at 5:30 a.m. gave them reason to believe that there was no emergency and that plaintiff was merely sleeping heavily and could be left alone, then why would it suddenly be alarming if he were still sleeping in the same place and manner at 6:20 a.m.? Defendants do not address these questions.

On a related point, plaintiff notes that IDOC and Dixon policies provide that any inmate who is found to be "unresponsive" should be treated as a medical emergency, which means that the correctional officer should "immediately notify on-duty medical personnel." PSAF ¶¶ 31-36. Plaintiff additionally notes that Gillette in his investigational interview stated that when Morgan called him in the first few minutes after seeing plaintiff, Morgan described plaintiff as being "unresponsive." Ex. B at 2. Putting these two undisputed facts together, plaintiff argues that this is another piece of evidence supporting his argument that defendants should have immediately sought medical help during this initial five-minute period.

As for the cellmate's statement that it was not uncommon for plaintiff to sleep on the floor, defendants seem to vacillate on whether it is important. On the one hand, as noted above, they give themselves credit for ignoring this statement, indicating that it played no role in their decision-making. On the other hand, they repeatedly mention the cellmate's statement in their briefs, suggesting it is still somehow significant to the analysis. To illustrate, in their reply brief, defendants attempt to boil down the entire case into one single overarching "principal question," which is the following:

> What should a correctional officer do when—during the early hours of 5:30 a.m.— he sees and hears an inmate laying down and snoring on his cell floor, *with his cellmate telling the officer it was common for the inmate to sleep on the floor*, and was hard to wake up, because of the medication the inmate was taking?

[247 at 2 (emphasis added); *see also* 224 at 4 ("*Perhaps most importantly*, Plaintiff's cellmate [] told Defendants that Plaintiff's current state was not unusual.") (emphasis added).] But the problem with relying, even in part, on the cellmate's statement is that plaintiff disputes that the cellmate made the statement in the way that Morgan described it in the Incident Report. In that report, Morgan wrote that that the cellmate told him that "this [*i.e.* referring to plaintiff's snoring and sleeping heavily on the cell floor] is not an uncommon situation due to the medication that [plaintiff] is on." Ex. D at 1. Although defendants build their arguments on the assumption that there is no dispute that the cellmate made this particular statement, plaintiff is disputing that claim. *See* DSMF ¶ 3 (plaintiff's response thereto). In Schott's interview of the cellmate conducted later on the same day as the incident, the cellmate provided additional facts that a jury could find are

6

inconsistent with Morgan's account of what the cellmate said. Ex. A. Specifically, according to Schott's interview summary, the cellmate conveyed the following facts: he and plaintiff had been cellmates since Christmas; plaintiff had a history of seizures and "falling out" frequently (falling out meant "passing out and unable to communicate or respond"); plaintiff had one of these seizures around 4:00 a.m. earlier that morning and was transported to the "dispensary." *Id.* As for the possible role plaintiff's medication played in the incident, the cellmate allegedly told Schott the following:

> Tyler stated Laskowski does take medication in the cell from bubble packs and that the bubble packs were refilled a couple of days ago. Tyler stated he noticed this morning that the bubble packs were empty and that Laskowski had several of the pills in a cup last night. Tyler stated he believed that Laskowski intended on taking the pills, which was uncommon for him to take that many at once. Tyler stated Laskowski made a verbal suicide threat a few months ago, but never said he would do it and he seemed to be fine since then.

*Id.* The cellmate's statement, as reported by Schott, is much different in tone and substance that the cellmate's statement, as reported by Morgan. (Note: both statements were given on the same day.) In the Schott version, the cellmate expressed concern that plaintiff had overdosed by taking *all* the pills in the bubble packs. Notably, the cellmate told Schott that it "was *uncommon* for [plaintiff] to take that many at once." *Id.* By contrast, in the Morgan version, the cellmate supposedly expressed his belief that it "no big deal" to see plaintiff sleeping on the floor, and he mentioned nothing about a seizure just a few hours earlier and nothing about plaintiff having taken all the pills in his bubble packs. These are sharply differing accounts, and a jury could ask why the Morgan report failed to include the additional information set forth in the Schott report.

 Another potential discrepancy between the two reports relates to the empty bubble packs found in plaintiff's cell that morning. In the Schott report, he concluded that plaintiff had attempted suicide by consuming all the medication in two 40-pill bubble packs he had received just two days earlier. Ex. 1 at 4. This conclusion was based on many pieces of evidence, including the cellmate's statement summarized above. But it was also based on the fact that the two bubble packs "were found empty in [plaintiff's] cell *at the time he was found unresponsive*." *Id.* at 4 (emphasis added). The report does not state who exactly discovered the empty bubble packs, but Morgan's report did not mention the bubble packs at all. Perhaps Morgan and Gillette simply overlooked them. But Morgan's report did note that the two men saw no cuts, bruises, or marks on plaintiff indicating he had fallen. In their opening brief, defendants stated that they "observed a man with absolutely no outward signs of an injury—no bruises, not cuts, *and nothing out of place* in the cell to indicate a fall." [224 at 10 (emphasis added).] This argument gives the impression that defendants searched the scene for contextual clues that might explain why plaintiff was sleeping heavily on the floor. However, given the fact that *someone else* searched the cell that same day and saw the empty bubble packs, which evidence was later relied on to conclude that plaintiff overdosed, a jury could wonder why neither Morgan nor Gillette saw this evidence. Again, the answer could be merely that they mistakenly overlooked it. Still, plaintiff could rely on this discrepancy, along with many other pieces of evidence, to build a case that Morgan's report suspiciously left out key facts.

There is one more very significant line of evidence regarding the 50-minute gap. Plaintiff argues that IDOC engaged in a "cover up" to hide the 50-minute gap. The argument is based on the deposition testimony of Schott. The following facts, taken directly from plaintiff's Rule 56.1 statement of additional facts, provide the relevant background for this argument:

- On the morning of the March 21, 2012 incident, IDOC Internal Security Investigator Andrew Schott, who was assigned to Dixon at the time, was charged with investigating the circumstances surrounding and leading to plaintiff's coma and hospitalization. PSAF ¶ 22.
- That same day, very early on in his investigation, Schott noticed that there was at least a 50 minute time-gap between the time when Morgan first found plaintiff unresponsive at 5:30 a.m., and when Gillette first contacted medical personnel for assistance at 6:20 a.m. *Id.* ¶ 23.
- That same day, Schott phoned his supervisor in Springfield to make his initial report of the investigation. During this call, Schott told his supervisor about the 50-minute gap. *Id.* ¶ 24.
- The next day, Schott's supervisor directed Schott not to investigate the actions of IDOC staff, including Morgan and Gillette, and to limit the focus of his investigation to only plaintiff's actions. *Id.* ¶ 25.
- The supervisor told Schott that the directive to limit the investigation came directly from the Office of the Chief of Investigations who, at that time, was Larry Beck. *Id.* ¶ 26.
- Schott told his supervisor that "This isn't right." Schott believed that the circumstances merited an inquiry into staff activities surrounding this incident, including the cause of the delay in time from when plaintiff was found to when he received medical attention. But Schott's supervisor told him to "do what you're being told to do," and so Schott proceeded to limit his investigation to only plaintiff's actions. Accordingly, although the Investigation Report includes Schott's conclusion that "MARTIN D. LASKOWSKI was found unresponsive in Housing Unit 27, Cell 52 on March 21, 2012 at approximately 5:30 am," and includes as an exhibit Nurse Berkeley's Incident Report showing that she was not called for help until "Approx. 6:20," Schott declined to include any analysis in the Report on the reasons for that 50-minute delay. *Id.* ¶ 27.
- Of the hundreds of cases Schott investigated during his time at IDOC, he could not recall another instance where his supervisor told him to limit the scope of an investigation after it had begun. *Id.* ¶ 28.

Notably, defendants have not disputed any of these facts, nor offered any contrary or contextualizing facts. In short, they basically concede there was a cover up of some sort. Their only argument, which is a short paragraph in their reply brief, is to declare that all this evidence "had nothing to do with" them and to accuse plaintiff of "arguing guilt by association." [247 at 6.] Defendants offer no case authority to suggest that this evidence should be deemed irrelevant, and defendants do not offer any explanation for why there would have been such a concerted effort, involving multiple people, all trying to hide the one key fact that is now being highlighted so forcefully by plaintiff in this litigation. In this court's view, the 50-minute gap in this case, like the infamous 18-minute gap in the Watergate tapes, is not something that can be lightly sloughed off. It calls out for some explanation. Defendants have not even tried to offer one. What valid reason would there be to go to such effort to hide this time gap? A jury could rely on this cover up as yet another piece of evidence that something improper took place here.

The only other argument defendants make regarding the 50-minute gap is a legal one. In their opening brief, although they avoid directly talking about the 50-minute gap, they do obliquely reference it when they suggest, at one point, that there is essentially a bright-line *per se* rule in the case law that waiting 50 minutes to provide medical attention could not ever constitute deliberate indifference. *See* [224 at 6 (stating that they "have been unable to locate any case law in which a delay of fifty minutes was held to be deliberate indifference")]. This argument is not persuasive. For starters, without even consulting the case law, this argument does not accord with common sense (just think of why people call 911 for various medical problems). As for the case law, it contains a wide spectrum of fact-specific scenarios to draw from, many involving less urgent issues more akin to chronic medical problems. For example, in *Brown v. Darnold*, 505 Fed. Appx. 584 (7th Cir. 2013), which is one of the cases defendants rely on, the Seventh Circuit stated: "we do not think the circumstances here, as alleged by Brown—back pain, which can be elusive and difficult to treat, and a delay of a few hours in providing a non-prescription pain reliever—add up to an Eighth Amendment violation." *Id.* at 587. Here, by contrast, plaintiff was in a coma, and his brain was being deprived of oxygen. *See generally Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015) ("In some cases, even brief, unexplained delays in treatment may constitute deliberate indifference"); *see also Orlowski v. Milwaukee Cty.*, 872 F.3d 417 (7th Cir. 2017) (reversing summary judgment in a case with roughly similar facts involving a methadone overdose).

In sum, the court finds that plaintiff has come forward with sufficient evidence to show that defendants were deliberately indifferent by ignoring plaintiff for 50 minutes even though they concluded early on that he was, by their own description, "unresponsive." It is true, as defendants argue, that they did not completely disregard plaintiff, and in fact, eventually got him to the Healthcare Unit. It is also true that there are no facts affirmatively proving that they intentionally ignored plaintiff or disliked him or were trying to punish him or had some other malevolent motive. Still, for all the reasons cited above, the court finds that plaintiff has brought forth enough evidence to survive summary judgment on the question of deliberate indifference.

The court next turns to defendants' second main argument. They argue that there is no evidence to suggest that the 50-minute delay in taking plaintiff to the Healthcare Unit caused any additional injury. This argument is much shorter than the first one, taking up only two paragraphs in the opening brief. The court finds that there are disputed facts on this issue.

Defendants argue that the testimony of plaintiff's expert, Neil H. Pliskin, was "equivocal" on the question of whether the 50-minute delay caused additional damage to plaintiff. Defendants argue that Dr. Pliskin, who is not a medical doctor, testified only that, *if* plaintiff were having seizures, then the delay *potentially* could have damaged his brain. DSMF ¶ 15. Defendants then argue that there is no evidence that he was having seizures in his cell.

The court is not persuaded by this argument. As an initial point, defendants' assertion that Dr. Pliskin's testimony was "equivocal" is an implicit admission that the testimony could be read two ways. On summary judgment, the court is obligated to construe this evidence in plaintiff's favor. Moreover, as plaintiff argues in this response, there is no requirement that the evidence must come from an expert. *See Gayton v. McCoy*, 593 F.3d 610, 624-25 (7th Cir. 2010) ("if the plaintiff

9

offers evidence that allows the jury to infer that a delay in treatment harmed an inmate, there is enough causation evidence to reach trial"). Relying on this standard, plaintiff points to a number of contextual facts. Plaintiff notes that when he was taken to the hospital, he was immediately diagnosed with an anoxic brain injury, meaning that his brain cells had been damaged due to oxygen deprivation to the brain. When Nurse Berkeley first saw him in the Healthcare Unit, his pulse oximetry readings were very low and he required breathing support from an oxygen rebreather. As for Dr. Pliskin, plaintiff points out that his testimony that the delay likely contributed to plaintiff's neuropsychological impairment is unrebutted. Defendants have not offered any rebuttal testimony, and their own retained expert had "no opinion" about Dr. Pliskin's conclusions. PSAF ¶ 21. On the question of seizures, plaintiff argues that there is inferential evidence that he did experience seizures, both before Morgan noticed him for the first time and that those seizures continued after he went to the hospital. Plaintiff's argument seems to be that it would be unlikely if the seizures had somehow stopped precisely for the 50-minute period only.[5] In their reply, defendants do not contest these facts, but instead repeat their earlier arguments about the supposed equivocal nature of Dr. Pliskin's testimony and the fact that he is not a medical doctor. Defendants may raise these arguments at trial, but for purposes of summary judgment, the court finds that plaintiff's evidence is sufficient.

## II. Defendant Dr. Bessie Dominguez—Treatment Of Plaintiff's Chronic Back Pain

Plaintiff alleges that Dr. Dominguez, the medical director at Dixon, was deliberately indifferent when treating plaintiff's back pain. The relevant treatment period begins with plaintiff's first visit to Dr. Dominguez on November 18, 2011 and continues through the summer of 2013—roughly a period of 20 months. Over this time, Dr. Dominguez treated plaintiff's pain using a "stepwise" approach in which she started with conservative pain medications. Plaintiff, however, wanted stronger opioid medications, both because he had found them helpful in the past and because the conservative medications were supposedly not working. In August 2013, plaintiff was seen by a separate doctor, Dr. Kim, who prescribed an opioid medication (MS Contin). This medication, according to plaintiff, provided the relief he had been seeking. From this point on and continuing over the next three years, Dr. Dominguez agreed to prescribe similar medications.

Plaintiff's claim is centered on the initial 20-month period when only conservative medications were prescribed. The question before the court is whether a reasonable jury could find that Dr. Dominguez was deliberately indifferent in not prescribing stronger medications sooner. Plaintiff acknowledges that Dr. Dominguez did not completely ignore him, seeing him, in plaintiff's words, "many times." [232 at 4.] However, in *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005) and other cases, the Seventh Circuit has held that a doctor's "ongoing refusal" to try new approaches or to refer an inmate to a specialist could eventually at some point turn into deliberate indifference. *Id.* at 653; *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473 (7th Cir. 2022) ("Doggedly persisting in an ineffective treatment can establish deliberate indifference.").

---

[5] According to the Mayo Clinic website, when a person is in a coma, "[s]wift action is needed to preserve life and brain function." The underlying premise is that every minute counts.

The court will begin with some factual background. Plaintiff is relying primarily on six medical visits he had with Dr. Dominguez. Set forth below is a summary of those visits, taken from the Rule 56.1 statements:

- **November 18, 2011.** Dr. Dominguez saw plaintiff for a physical exam. She noted that he had a history of chronic lower back pain, a spinal fusion, and a partial lobectomy, as well as a history of suicide attempts. On exam, his neurological reflexes were normal, as were his spine and musculoskeletal system. There is a dispute about whether he complained about back pain at this visit. Dr. Dominguez testified that he did not. She explained that if he had been complaining, she would have made a separate appointment to address that issue. Plaintiff states that he complained about back pain at every visit. DSMF ¶¶ 15-17.
- **February 6, 2012.** Plaintiff stated that his back was hurting and that he had the pain for 14 or 15 years. Dr. Dominguez noted that prior x-rays showed degenerative changes in plaintiff's cervical to his lumbar spine. She believed that his degenerative changes were consistent with normal aging. On exam, plaintiff could raise both legs to 30 degrees and could bend down forward to 40 degrees using his lumbar spine. These findings indicated that he had slightly limited range of motion. He also had back muscle spasms and was depressed. Dr. Dominguez prescribed him Mobic 7.5mg, a NSAID medication, twice a day for his back pain and baclofen for his muscle spasms. *Id.* ¶¶ 18-22.
- **August 30, 2012.** Dr. Dominguez saw plaintiff regarding his request for a cane that his psychiatrist wanted him to get since he was on Klonopin, which could make his gait unsteady. There is a dispute about whether plaintiff complained about back pain. Dr. Dominguez asserts that he did not complain, and plaintiff again reiterates that he complained at every single visit. On exam, he showed good balance in a Romberg balance test, and was able to walk around the room, showing that his gait was normal. Dr. Dominguez thus concluded that a cane was not needed. Plaintiff argues that this decision was motivated also by concern that plaintiff would use the cane for self-harm given his recent overdose. *Id.* ¶¶ 29-31.
- **December 24, 2012.** Dr. Dominguez saw plaintiff for a complaint of back pain and a question about heartburn medications. She noted that plaintiff was mentally disturbed and manipulative (he denies this characterization). On exam, she assessed him with having good leg raises, flexion, range of motion, and noted that he was able to bend and touch his toes and had a good range of motion. She planned to prescribe a 30-day supply of Tylenol 680 milligrams, one tab twice a day for the back pain. *Id.* ¶¶ 36-39.
- **February 12, 2013.** Dr. Dominguez saw plaintiff for a follow-up for his back pain. He reported that he had a fusion in his lower back 10 years earlier and had previously been given morphine and OxyContin. According to Dr. Dominguez, during the exam, plaintiff "was very hostile and verbally abusive" towards her. (Plaintiff denies that he was ever at any time hostile or verbally abusive toward Dr. Dominguez.) Plaintiff demonstrated some decreased range of motion in his lower extremities and while bending forward and twisting side to side. Dr. Dominguez assessed him with chronic pain from his neck to his lower back. She testified that she believed plaintiff's chronic back pain was not an everyday type of pain, but was more episodic (plaintiff disputes this claim). Dr. Dominguez ordered back x-rays. She also continued his prescription for Tylenol and Protonix. The Tylenol

11

prescription was changed from 680 milligrams twice a day as prescribed at the December visit to 650 milligrams twice a day. She also planned a follow-up after his x-rays were completed. *Id.* ¶¶ 42-44.

- **June 5, 2013.** Dr. Dominguez saw plaintiff for a complaint about acid reflux. He reported that his Zantac and Indocin were not working. Although back pain was not his chief complaint at this visit, he claims he still mentioned this problem and that he specifically asked for narcotics. On exam, he had a normal gait and normal range of motion in his neck, legs, and back. Dr. Dominguez prescribed another NSAID medication, Naproxen 500 mg. She thought Naproxen was worth a try because patients with spinal pain respond to the medication, and she could not rule out its efficacy until it was tried. *Id.* ¶¶ 49-50.

Plaintiff makes several arguments based on the particular treatment decisions made by Dr. Dominguez during these six visits in 2011-2013. But he is also relying more generally on treatment he received many years earlier for his back problems. He was treated by two pain specialists. First, in the 1998 to 2000 timeframe, he was treated by Dr. Thomas Basch for a back problem and was eventually awarded Social Security disability benefits based, in part, on Dr. Basch's deposition testimony in that case. Plaintiff has submitted treatment notes from Dr. Basch, a portion of his deposition transcript, and the ruling issued by the Social Security administrative law judge. Second, in 2006, while plaintiff was incarcerated at the Hancock County Jail, he was treated over a several-month period by an outside pain specialist, Dr. L. Nguyen. Plaintiff has submitted some prison medical records from this visit. Plaintiff argues that Dr. Basch and Dr. Nguyen, two pain specialists, successfully treated him by prescribing opioid medications. Given this history, plaintiff believes that Dr. Dominguez was not operating on a blank slate when she first saw him and should have deferred to the judgment of these two pain specialists by starting plaintiff on opioid medications from the get-go, rather than fumbling around with conservative medications for over a year. There are, however, several significant problems with this argument.

First, Dr. Dominguez testified that she was not aware of these earlier medical records. She was aware of some of plaintiff's general medical problems from this period, including the fact that he had a benign tumor removed from around his spine. Dep. at 64-65. But she testified that she had not seen the specific records plaintiff is now relying on. *Id.* Plaintiff has not offered any evidence to indicate that she reviewed these records, nor established that she had an obligation to somehow search them out.

Second, even if Dr. Dominguez did review this evidence, this does not mean that she was obligated to rotely follow prior treatment decisions in cookie-cutter fashion. Many years had elapsed, with significant intervening events. Dr. Dominguez knew that plaintiff had been able to function without strong pain medications for the two years immediately before he began seeing her. This suggests he had some ability to manage his pain without these medications. Also, as discussed below, he had a history of abusing narcotics. At her deposition, Dr. Dominguez was shown some of these medical records and asked whether they might have changed her treatment decisions if she had seen them earlier, and she answered "no." Dep. at 214.

12

Third, even putting the first two points aside, the documentary evidence submitted by plaintiff, although fairly lengthy and detailed, paints a mixed picture. As for Dr. Basch, who was treating plaintiff for chronic back pain due to degeneration and also for pain relating to a recent construction accident, he did prescribe both epidural injections and opioid medications such as MS Contin and OxyContin. Plaintiff testified in his deposition, which was taken many years after that fact, that he recalled this treatment as being generally "very effective." Dep. at 31. The suggestion is that it was a simple and easy process. But a closer examination of this evidence (set forth in plaintiff's exhibit 1) suggests a bumpier process. Dr. Basch experimented with medications over time. In some respects, his process of experimentation with different medications mirrors the one used by Dr. Dominguez. Also, the Basch evidence suggests that the opioid medications were not always successful. *See* Ex. 1 at 3 ("Martin is having difficulty with pain. He is on MS Contin, appropriate co-analgesic agents, anti-inflammatory medications *but finds that his low back pain is very painful*.") (emphasis added). There were ongoing problems with side effects from the opioid medications, such as sleepiness and loss of appetite. *Id.* at 7. And even back then, Dr. Basch was already expressing concern about plaintiff's tendency to "overuse" these medications. *See id.* at 6 ("We've kept Martin away from short acting analgesic's as of late because when his pain escalates he tends to overuse them."); *id.* at 7 ("overuses his medication").[6]

As for Dr. Nguyen's treatment in 2006, this evidence is even less clear. It does not appear that plaintiff has submitted any treatment notes directly from Dr. Nguyen. Instead, he is relying on the handwritten medical records prepared by someone at the Hancock County Jail. These records are mostly lists of the medications plaintiff was given at various points. *See* [221-3 at 98-114]. Although these records do indicate that he was prescribed some opioid medications such Tramadol, Oxycodone ER, and Methadone, these records do not indicate how successful they were, nor whether they contributed to his later troubles with overuse of these medications. And some of these medications were stopped after being tried for a period, suggesting that they were ineffective, although there is not enough information to draw any hard conclusions one way or another. In sum, although plaintiff argues that these two doctors had "already determined [what medications were] effective," the supporting evidence is more suggestive of mixed success over only short-term periods. [232 at 16.] In this court's view, this history is insufficient to allow a jury to find that Dr. Dominguez was *compelled* to immediately prescribe opioid medications when she first saw plaintiff.

The court will now turn back to the six visits summarized above. Plaintiff complains that Dr. Dominguez only prescribed Tylenol and various NSAIDs (*e.g.* Advil, Aleve, and Naprosyn) during this 20-month period and, on two visits, prescribed *no* medication at all. Plaintiff pejoratively describes Dr. Dominguez's "stepwise" approach as a fruitless "cycling through ineffective NSAID drugs for a year and a half." *Id.* According to plaintiff, these treatment decisions

---

[6] Although a smaller part of plaintiff's case, he has periodically also suggested that Dr. Dominguez should have given him epidural injections because they supposedly worked when given by Dr. Basch. Here again, the evidence is ambiguous. *See* Ex. 1 at 3 ("Epidural injection helped Martin considerably for one month's time. Over the past week however his pain has returned to a fairly significant extent."); *id.* at 5 ( "Epidural helps transiently."); *id.* at 10 (Social Security ruling: "the claimant received epidural injections although the benefits of the injections were short-lived and then his pain *became considerably worse*") (emphasis added).

13

were so out of the medical mainstream, so unjustified, that a reasonable jury could conclude that Dr. Dominguez had abdicated all medical judgment and was acting in a manner akin to recklessness. See *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (deliberate indifference requires "something akin to recklessness").

This court is not persuaded by this argument. As an initial background point, the general approach of starting conservatively with less powerful medications and then spending some time trying different combinations is a common approach in treating chronic back pain. *See, e.g.*, *Black v. Wexford Health Sources, Inc.*, 2021 WL 4147296, *3 (S.D. Ill. Sept. 13, 2021) ("Although Black would prefer surgery or different medication, nothing in the medical records support a finding that the current course of treatment of trying additional medications, adjusting dosages, and further physical therapy deviates from acceptable professional standards in treating back pain."). As the Seventh Circuit has observed, chronic back pain "can be elusive and difficult to treat." *Brown v. Darnold*, 505 Fed. Appx. 584, 587 (7th Cir. 2013). Dr. Dominguez also relied, in part, on the fact that plaintiff's objective examination findings supported a more conservative approach initially. Dep. at 71 ("[plaintiff] was able to do the usual tests that we do for people with back pains, and it wasn't bad at all"); 241 at 13 (plaintiff "often showed no significant positive findings or physical limitations"). Significantly, plaintiff has not come forward with a medical expert who is willing to opine that Dr. Dominguez's approach was not a valid medical choice in light of all the facts at hand. *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.' ") (quoting *Collignon v. Milwaukee Cty*, 163 F3d 982, 988 (7th Cir. 1998)).

In addition to these reasons, perhaps the biggest reason given by Dr. Dominguez for not being more aggressive in prescribing narcotics is that she was concerned about creating (or re-starting) an opioid addiction.[7] It is undisputed that plaintiff had a long and troubled history with pain medications, characterized by defendant as a "checkered history." It involved multiple suicide attempts and crimes fueled by OxyContin.[8] Dr. Dominguez told plaintiff that this history was one reason she was reluctant to prescribe opioid medications. She specifically told him that she was concerned that stronger medications could be used to commit suicide. Pl. Dep. at 68. This conservative treatment approach was also justified because, as discussed above, plaintiff had been able to function for several years without any of these stronger medications. *See, e.g., Lockett v. Bonson*, 937 F.3d 1016, 1020, 1024-25 (7th Cir. 2019) (nurse "noted that [the inmate's] chronic symptoms had been managed successfully on the weaker drug prior to the crisis, that the stronger drug carried additional concerns for substance abuse"). Plaintiff does not dispute that this history was a valid factor for Dr. Dominguez to consider in choosing which treatment approach to use. Plaintiff suggests that concerns about suicide could have been dealt with by ordering that the opioid

---

[7] *See generally* Judith Grisel, *Never Enough: The Neuroscience and Experience of Addiction*, p. 64 (2019) (opiates are the second most addictive drug behind nicotine and "many [addicts] begin their addiction in a doctor's office").

[8] The following facts are undisputed: "Plaintiff estimates he has attempted suicide three or four times. He attempted to commit suicide by stabbing himself, ingesting polyurethane, ingesting OxyContin, ingesting sleeping pills, eating a tube of triple antibiotic cream, and wrapping a phone cord around his neck. Plaintiff's drug-induced homicide conviction involved the use of his prescription OxyContin. At the time he committed his crime, Plaintiff also attempted to commit suicide using the same OxyContin." DSMF, ¶¶ 5-6 (internal citations omitted).

medications be taken on a "watch/take" basis where a nurse would monitor the use of the drug. Even if this approach were feasible, it still does not address the longer-term concerns about addiction.

Another relevant factor to consider is that Dr. Dominguez's treatment over this 20-month period was interrupted by plaintiff's overdose and apparent suicide attempt in March 2012. After this incident, plaintiff stayed for an extended period at the hospital and did not see Dr. Dominguez again for several months. Plaintiff was under the care of other doctors during this time. Also, throughout the 20-month period, he was being treated by a psychiatrist, Dr. Nielsen, and other doctors (*e.g.* Dr. Kim and Dr. Wall). Overall, these interruptions would have complicated the process of experimenting with less addictive medications. Stated differently, this was not an uninterrupted and smooth period of treatment over the 20 months.

Plaintiff also raises a few other arguments, but the court finds that they do not change the basic calculus set forth above. Plaintiff notes that Dr. Kim, on August 2, 2013, prescribed an opioid medication in the first visit with plaintiff. Plaintiff claims that this medication was immediately effective, thus supposedly showing that Dr. Dominguez had been deliberately indifferent up until that point. This is a weak inference that omits important context. When Dr. Kim made the decision to prescribe an opioid medication, he had the evidence from the immediately-preceding 20-month period about the apparent ineffectiveness of the NSAIDs. In contrast, when Dr. Dominguez first started treating plaintiff, she knew that he had been functioning adequately for the immediately-preceding two years without using narcotics. Plaintiff also seems to fault Dr. Dominguez for changing her approach at this point and agreeing to prescribe opioid medications for the next three years. It is not clear to the court why Dr. Dominguez should be faulted for being willing to change tactics and to follow Dr. Kim's approach. If she had stuck to her original approach, then she likely would have been accused of "doggedly" sticking to a failed approach.[9] Plaintiff separately claims that Dr. Dominguez made an admission in her deposition that she knew in real time (*i.e.* before the medications were even tried by plaintiff) that they would not work. Dep. at 64. This is an unfair reading of the testimony. The court agrees with the defendant that she was merely stating that—*in hindsight*—she now agreed that the medications had not worked as she was "hoping" they would work when she prescribed them. Dep. at 255.

Plaintiff also asserts that there was a general "culture" at Dixon against providing "strong pain medication to inmates." [232 at 3.] The evidence for this proposition is speculative, but regardless of what the general culture may have been, and regardless of whether that culture may have been medically justified given the potential abuse with opioid medications, there were specific reasons tied to plaintiff's particular history (as summarized already) that warranted caution in deciding whether to prescribe him opioid medications. Plaintiff also complains that Dr. Dominguez had a "general dislike or indifference toward" toward him and thought he was "disturbed" and "manipulative." *Id.* at 16. The court does not find that this generalized assertion,

---

[9] It is true, as plaintiff points out, that Dr. Dominguez changed her mind even though some of the objective tests she had relied on previously were still showing normal findings. But Dr. Dominguez never stated that the objective findings were the only factor to be considered. She had to make holistic assessments each time after considering multiple factors.

15

without more, is enough to counteract all the above evidence. It is always possible that a doctor might develop a dislike of particular patients, but the important question is still the one analyzed above, which is whether there were valid and objective reasons for the medical treatment being chosen.

For all the above reasons, the court finds that no reasonable jury could find that Dr. Dominguez's stepwise approach, based on a valid concern for opioid addiction, was unreasonable. Although it is possible that another doctor, such as Dr. Kim, might have chosen to prescribe opioid medications sooner, the court is not persuaded that a reasonable jury could find that Dr. Dominguez's decision to try a conservative medication approach, under the unique facts of this case, was medically unreasonable in way that is akin to recklessness. *See Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (deliberate indifference is "not medical malpractice").

## ORDER

The motion for summary judgment filed by defendants Troy J. Morgan and Tony S. Gillette [222] is denied. The motion for summary judgment filed by defendant Bessie Dominguez [219] is granted, and summary judgment is granted to defendant Dominguez. Plaintiff's counsel and counsel for defendants Morgan and Gillette are directed to contact Magistrate Judge Schneider's courtroom deputy within 30 days to arrange for a settlement conference. The court thanks appointed counsel for their vigorous representation to date on plaintiff's behalf.

Date: 3/24/2022　　　　　　　　　　　ENTER:

*Philip G. Reinhard*
_____
United States District Court Judge

Electronic Notices. (LC)